**Nos. 21-7000 (lead), 21-4027, -4028, -4031, -4032, -4033, -4080, -4082, -4083, -4084, -4085, -4086, -4087, -4088, -4089, -4090, -4091, -4092, -4093, -4094, -4095, -4096, -4097, -4099, -4100, -4101, -4102, -4103**
**MCP No. 165**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

IN RE: OSHA RULE ON
COVID-19 VACCINATION AND
TESTING, 86 FED. REG. 61402

---

On Petitions for Review

---

# RESPONDENTS' EMERGENCY MOTION TO DISSOLVE STAY

---


BRIAN M. BOYNTON
*Acting Assistant Attorney General*
SARAH E. HARRINGTON
*Deputy Assistant Attorney General*
MICHAEL S. RAAB
ADAM C. JED
BRIAN J. SPRINGER
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*

*Of Counsel:*

SEEMA NANDA
*Solicitor of Labor*
EDMUND C. BAIRD
*Associate Solicitor for*
*Occupational Safety and Health*
LOUISE M. BETTS
*Counsel for Appellate Litigation*
BRIAN A. BROECKER
MARISA C. SCHNAITH
*Attorneys*
*U.S. Department of Labor*
*Office of the Solicitor, Suite S4004*
*200 Constitution Ave., NW*
*Washington, DC 20210*

**TABLE OF CONTENTS**

**Page**


INTRODUCTION ... 1

STATEMENT ... 3

A. Legal Background ... 3

B. Factual Background ... 4

C. COVID-19 Vaccination And Testing Emergency Temporary Standard ... 4

D. Procedural History ... 6

ARGUMENT ... 9

I. Petitioners Are Unlikely To Succeed On The Merits ... 9

A. OSHA Reasonably Concluded That The Standard Is Necessary To Address A Grave Danger ... 9

B. The Fifth Circuit's Statutory Interpretation Was Flawed ... 12

C. The Fifth Circuit's Discussion Of "Constitutional Concerns" Was Mistaken ... 18

D. OSHA Had Ample Basis For Its Determinations ... 22

II. The Balance Of Equities Also Precludes The Extraordinary Relief Petitioners Seek ... 40

III. If This Court Disagrees, The Stay Should Still Be Modified ... 46

CONCLUSION ... 52

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

COVID-19 has killed more than 750,000 people and caused "serious, long-lasting, and potentially permanent health effects" for many more. Pmbl.-61424. The virus poses an acute workplace danger. Significant exposure and transmission, including numerous workplace "clusters" and "outbreaks," are occurring in workplaces throughout the Nation. Pmbl.-61411. Employees "are being hospitalized with COVID-19 every day, and many are dying." Pmbl.-61549.

Acting pursuant to its express statutory authority to issue standards that ensure safe and healthful places of employment, the Occupational Safety and Health Administration (OSHA) issued an emergency temporary standard to address the grave danger of COVID-19 in the workplace. This Standard gives employers the option of requiring vaccination or requiring their unvaccinated employees to mask and test. The Standard reflects OSHA's judgment that these measures are necessary to mitigate COVID-19 transmission in the workplace, and the grievous harms the virus inflicts on workers. OSHA estimates that the Standard will, at a minimum, "save over 6,500 worker lives and prevent over 250,000 hospitalizations over the course of the next six months." Pmbl.-61408.

Before the various petitions for review were assigned to this Court, the Fifth Circuit granted a stay and enjoined the implementation and enforcement of the Standard. The Fifth Circuit's stay should be lifted immediately. That court's principal rationale was that OSHA allegedly lacked statutory authority to address the grave danger

of COVID-19 in the workplace on the ground that COVID-19 is caused by a virus and also exists outside the workplace. That rationale has no basis in the statutory text. Congress charged OSHA with addressing grave dangers in the workplace, without any carve-out for viruses or dangers that also happen to exist outside the workplace. The Fifth Circuit also faulted the Standard for supposedly being both over- and underinclusive, because OSHA did not immediately require the workplace precautions from employers with fewer than 100 employees, and because the Standard otherwise covers employees of different ages and health histories at various types of workplaces. OSHA recounted extensive empirical data showing that all employees can transmit COVID-19 in the workplace and that COVID-19 has spread in a vast variety of workplaces. The Fifth Circuit identified nothing in the statute requiring OSHA to proceed on a more granular employer-by-employer or employee-by-employee basis. OSHA also explained that given the urgency of the situation, it was proceeding in a stepwise fashion by imposing mandatory workplace precautions on those employers about which OSHA has sufficient information to ensure feasibility while simultaneously seeking comment and undertaking further study on smaller employers.

Even setting aside the merits, petitioners have not shown that their claimed injuries outweigh the interest in protecting employees from a dangerous virus while this litigation proceeds. Petitioners' asserted injuries are speculative and depend heavily on minor compliance costs or predictions about how employees may respond that are at odds with empirical evidence addressed by the agency. These claimed injuries do not

justify delaying a Standard that will save thousands of lives and prevent hundreds of thousands of hospitalizations.

## STATEMENT

### A. Legal Background

The Occupational Safety and Health Act of 1970 (OSH Act) seeks "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). The Act vests the Secretary of Labor, acting through OSHA, with "broad authority" to establish "standards" for health and safety in the workplace. *Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 611 (1980) (plurality op.); *see* 29 U.S.C. §§ 654(a)(2), (b), 655.

OSHA can establish, through notice-and-comment rulemaking, permanent standards that are "reasonably necessary or appropriate" to address a "significant risk" of harm in the workplace. *Industrial Union*, 448 U.S. at 642-643 (plurality op.) (quotation marks omitted); *see* 29 U.S.C. §§ 652(8), 655(b). If OSHA "determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards," and (B) that a standard "is necessary to protect employees from such danger," OSHA can issue emergency temporary standards that take "immediate effect" and also serve as "proposed rule[s]" for notice-and-comment rulemaking. 29 U.S.C. § 655(c). Such temporary standards are "effective until superseded" by a permanent standard, and OSHA "shall promulgate" such a standard within "six months." *Id.* § 655(c)(2)-(3).

### B. Factual Background

The novel COVID-19 virus is "highly transmissible" and deadly. Pmbl.-61409. COVID-19 has already killed more than 750,000 people in this country and caused "serious, long-lasting, and potentially permanent health effects" for many more. Pmbl.-61424. Significant exposure and transmission, including numerous workplace "clusters" and "outbreaks," are occurring "in workplaces" throughout the Nation. Pmbl.-61411.

OSHA has continuously monitored the pandemic and previously hoped for "widespread voluntary compliance" with "safety guidelines" to protect against this workplace threat. Pmbl.-61444. In recent months, however, "the risk posed by COVID-19 has changed meaningfully," Pmbl.-61408, and "nonregulatory" options have proven to be vastly "inadequate," Pmbl.-61430, 61444. As more employees returned to workplaces, the "rapid rise to predominance of the Delta variant" meant "increases in infectiousness and transmission." Pmbl.-61409; *see* Pmbl.-61411-66. As a result, "[u]nvaccinated workers are being hospitalized with COVID-19 every day, and many are dying." Pmbl.-61549.

### C. COVID-19 Vaccination And Testing Emergency Temporary Standard

On November 5, 2021, OSHA published an emergency temporary standard to address these "extraordinary and exigent circumstances." Pmbl.-61434. The Standard requires employers with 100 or more employees to select one of two workplace

precautions to mitigate the danger of COVID-19 transmission in places of employment. Employers may "implement a mandatory vaccination policy." Pmbl.-61436. Or employers may offer employees the choice to have "regular COVID-19 testing" and "wear a face covering" rather than get vaccinated. Pmbl.-61520. The Standard staggers compliance deadlines, providing 60 days to implement the testing requirements and 30 days to implement all other requirements. Pmbl.-61549. Employees who exclusively work from home, alone, or outdoors are exempted. Pmbl.-61419.

OSHA determined that unvaccinated employees face a "grave danger" from workplace exposure to COVID-19. The COVID-19 virus, OSHA determined, "is both a physically harmful agent and a new hazard." Pmbl.-61408. OSHA described myriad studies showing workplace "clusters" and "outbreaks" and other significant "evidence of workplace transmission" and "exposure." Pmbl.-61411. And OSHA explained that "employees can be exposed to the virus in almost any work setting." *Id.*

OSHA also determined that it was "necessary" to adopt the Standard to protect employees from this danger in the workplace. Pmbl.-61436. OSHA described extensive evidence showing that vaccines dramatically reduce the risk of contracting and transmitting COVID-19, as well as developing serious disease. Pmbl.-61434, 61520, 61528-29. OSHA further explained that masking "largely prevent[s]" infected employees "from spreading [COVID-19] to others," and testing identifies infected employees to be removed from the workplace. Pmbl.-61438-39. OSHA discussed various alternatives and explained that existing OSHA standards, statutory

requirements, and non-binding guidance are insufficient to combat the new hazard. Pmbl.-61440-45.

### D. Procedural History

**1.** In the week following issuance of the Standard, a number of parties filed petitions for review in various courts of appeals and several of those petitioners sought stays pending review. The Fifth Circuit entered an administrative stay on Saturday, November 6 and ordered the government to respond by Monday, November 8 to two stay motions, which the court characterized as seeking "a permanent injunction." On November 8, the court also ordered the government to respond to a separate stay motion by noon on November 10.

In addition to arguing that a stay is unwarranted, the government contended that these requests for interim (or permanent) relief were premature. Specifically, the government explained that under 28 U.S.C. § 2112, the various cases would be randomly assigned to one court of appeals on or about November 16. And the government further explained that because those petitioners claimed little prospect of harm until December 7 at the earliest, no need existed to rule on the stay motions before the various cases were consolidated in one court.

**2.** On November 12, the Fifth Circuit issued an opinion addressing motions to stay the Standard (which it referred to, in places, as the "vaccine mandate"). The court stayed the Standard "pending adequate judicial review of the petitioners' underlying motions for a permanent injunction," and ordered that "OSHA take no steps to

implement or enforce the [Standard] until further court order." *BST Holdings, LLC v. OSHA*, No. 21-60845, slip op. 3, 21 (5th Cir. Nov. 12, 2021).

The court did not address whether the COVID-19 virus is a "physically harmful" "agent" or a "new hazard" as those terms are used in the statute. The court, however, found "compelling" the "argument that § 655(c)(1)'s neighboring phrases 'substances or agents' and 'toxic or physically harmful' place an airborne virus beyond the purview" of the statute. Slip op. 9. And the court suggested that the COVID-19 virus cannot be a "new hazard" under the statute because OSHA previously described COVID-19 as a "recognized hazard" in a 2020 court filing. *Id.* at 10.

While the Fifth Circuit acknowledged COVID-19's "tragic and devastating" effects, the court questioned whether COVID-19 poses a "grave danger" and declared that OSHA cannot protect employees from workplace transmission without "mak[ing] findings of exposure—or at least the presence of COVID-19—in *all* covered workplaces," which OSHA "cannot possibly" do. Slip op. 10-11. The court similarly suggested that the Standard cannot be necessary to address a grave danger to employees. The court did not meaningfully address OSHA's extensive explanations. The court instead quoted at length from statements OSHA made in a litigation filing shortly after the pandemic began. *Id.* at 2, 8 n.14, 12, 13-15. The court also characterized public statements made by the President about the ongoing pandemic. Based heavily on those statements, the court declared that OSHA's 150-page analysis is "pretextual" and the "true purpose is not to enhance workplace safety." *Id.* at 12, 15. Raising an argument

that was not presented in the operative stay motions, the court questioned why OSHA had not extended the Standard to small employers, and the court declined to credit the agency's stated reason. *Id.* at 15. The court also asserted that "the ongoing threat of COVID-19 is more dangerous to *some* employees than to *other* employees," *id.* at 13, and concluded that given employees' varied ages, prior infections, and differences between workplaces, OSHA could not issue any generally applicable standard.

Without definitively resolving any constitutional challenge, the court posited that the Standard "likely exceeds the federal government's authority under the Commerce Clause." Slip op. 6, 16. While recognizing that commercial employers "are the targets of" regulation by the Standard, *id.* at 4 n.5, the court labeled an employee's "choice to remain unvaccinated and forgo regular testing" as "noneconomic inactivity." *Id.* at 16. The court identified "concerns over separation of powers principles" that separately "cast doubt" on the Standard. *Id.* at 17.

The Fifth Circuit determined that the balance of equities also favored a stay. The court stated that companies face compliance costs, "lost or suspended employee[s]," "diversion of resources," and possible "financial penalties." Slip op. 19. And the court relied on States' interest "in seeing their constitutionally reserved police power over public health policy defended from federal overreach." *Id.* The court also opined that "the mere specter of" the Standard caused "economic uncertainty" and "upheaval," and threatened "our constitutional structure." *Id.* at 20. By contrast, according to the Court, OSHA's interests were "illegitimate." *Id.* at 19. The Court did not address OSHA's

detailed estimates that the Standard would save thousands of lives and prevent hundreds of thousands of hospitalizations over a six-month duration.

**3.** On November 16, pursuant to 28 U.S.C. § 2112(a), the Judicial Panel on Multidistrict Litigation consolidated and transferred the pending petitions to this Court. No court except the Fifth Circuit ruled on a stay motion before the Judicial Panel issued its consolidation order.[1]

## ARGUMENT

Petitioners have not shown that they are likely to succeed on the merits, that they face any irreparable harm, or that the balance of equities and public interest tilt in their favor. *See Nken v. Holder*, 556 U.S. 418, 434-435 (2009); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2]

### I. Petitioners Are Unlikely To Succeed On The Merits

#### A. OSHA Reasonably Concluded That The Standard Is Necessary To Address A Grave Danger

OSHA is entrusted with issuing emergency temporary standards if the agency determines that such a standard is necessary to protect employees from a grave danger.

---

[1] Pursuant to the multi-circuit process, any stay issued before the transfer may "be modified, revoked, or extended" by the court "designated" to hear the case. 28 U.S.C. § 2112(a)(4).

[2] Although styled as motions for "stays," petitioners sought orders modifying the pre-litigation status quo that are better characterized as injunctions. *See Nken*, 556 U.S. at 428-429. But because the equitable standards are substantially the same, that does not affect the analysis.

29 U.S.C. § 655(c)(1). OSHA thoroughly explained its determinations, and substantial evidence supports these findings.

**1.** OSHA properly "determine[d]" that the COVID-19 virus causes employees to be "exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards." 29 U.S.C. § 655(c)(1). The virus is both a physically harmful agent and a new hazard. Pmbl.-61408. It readily fits the definition of an "agent," which is "a chemically, physically, or biologically active principle." *Agent*, Merriam Webster[3]; *see also Virus*, Merriam Webster (defining "virus" as an "infectious agent[]").[4] OSHA's decades-old regulations have previously explained as much. *See, e.g.*, 29 C.F.R. § 1910.1020(c)(13) (defining "toxic substances or harmful physical agents" to include "biological agent[s] (bacteria, virus, fungus, etc.)"); *id.* § 1910.1030 (bloodborne-pathogens rule issued pursuant to authority to regulate "toxic materials or harmful physical agents"). The COVID-19 virus also constitutes a "new hazard." It is "a source of danger" by any understanding of the term. *Hazard*, Merriam Webster.[5] And it was unknown in the United States until early 2020. Pmbl.-61408.

OSHA also reasonably concluded that the highly contagious and virulent COVID-19 virus presents a "grave danger"—that is, a threat of great harm or injury—

[3] https://perma.cc/3LBN-PY3D.
[4] https://perma.cc/86KB-VSMY.
[5] https://perma.cc/FUL7-79ZR.

to employees. *See Grave*, Merriam Webster[6]; *Danger*, Merriam Webster[7]; *see also Florida Peach Growers Ass'n v. U.S. Dep't of Labor*, 489 F.2d 120, 132 (5th Cir. 1974) ("incurable, permanent, or fatal consequences to workers"). COVID-19 has killed hundreds of thousands of people in the United States and caused "serious, long-lasting, and potentially permanent health effects" for many more. Pmbl.-61424. The virus is "highly transmissible," Pmbl.-61409, and OSHA described several studies showing workplace "clusters" and "outbreaks" and other significant "evidence of workplace transmission" and "exposure," Pmbl.-61411-17. With the risk of exposure cutting across workplaces, the country continues to see daily hospitalization and death of unvaccinated workers. Pmbl.-61411-17, 61435.

**2.** OSHA properly "determine[d]" that the Standard "is necessary to protect employees" from this grave danger. 29 U.S.C. § 655(c)(1). The Standard utilizes "the most effective and efficient workplace control available: vaccination," and it offers, as an alternative, "regular testing [and the] use of face coverings." Pmbl.-61429. Citing extensive evidence, OSHA recognized that vaccination "reduce[s] the presence and severity of COVID-19 cases in the workplace," and effectively "ensur[es]" that workers are protected from being infected and infecting others. Pmbl.-61520. OSHA properly exercised its discretion to offer an alternative whereby employees can be "regularly tested for COVID-19 and wear a face covering." Pmbl.-61436. The Standard provides

---

[6] https://perma.cc/TP9D-JLHG.

[7] https://perma.cc/6B3M-NRXT.

employers with this choice because they are better positioned to determine which approach will "secure employee cooperation and protection." *Id.* OSHA thus crafted a regulatory approach that protects unvaccinated workers while leaving leeway for employers to determine the most appropriate option for their workplaces.

Taken together, these risk-mitigation methods will protect unvaccinated workers against the most serious health consequences of a COVID-19 infection and "reduce the overall prevalence" of the COVID-19 virus "at workplaces." Pmbl.-61435. OSHA estimates that the Standard will save thousands of workers' lives and prevent hundreds of thousands of hospitalizations over the course of six months. Pmbl.-61408. OSHA also properly concluded that its existing regulatory tools do not "provide for the types of workplace controls that are necessary to combat the grave danger addressed by" the Standard. Pmbl.-61441.

### B. The Fifth Circuit's Statutory Interpretation Was Flawed

**1.** The Fifth Circuit's suggestion that OSHA cannot address workplace dangers posed by "an airborne virus" or a virus that exists both inside and outside the workplace, slip op. 9-10, has no basis in the statutory text, which broadly refers to "agents" and "new hazards," 29 U.S.C. § 655(c)(1). The plain reading of that language does not grant "virtually unlimited power," slip op. 17, but rather is limited to those agents or hazards that endanger "employees," 29 U.S.C. § 655(c)(1), and is further limited by the general rule that OSHA standards may apply only to "employment and

places of employment," *id.* § 652(8), and by the specific "grave danger" and necessity requirements for issuing emergency standards.

The Fifth Circuit did not dispute that the COVID-19 virus falls within the ordinary meaning of the terms "physically harmful," "agents," and "new hazard." Instead, the court mistakenly read those terms as excluding viruses—or at least some viruses—by looking to different but neighboring words like "toxic" that, in the court's view, "connot[e] *toxicity* and *poisonousness*." Slip op. 9-10. Initially, "toxic" also means "[h]armful, destructive, or deadly," *American Heritage Dictionary* 1282 (2d Coll. ed. 1982), and imputing that "connot[ation]," slip op. 9-10, to the other statutory terms does not render OSHA unable to protect employees from viruses in the workplace. Even setting that aside, the relevant provision is written in the disjunctive, allowing OSHA to address a grave danger from "substances *or* agents determined to be toxic *or* physically harmful *or* from new hazards." 29 U.S.C. § 655(c)(1) (emphases added). By "ignor[ing] the disjunctive 'or,'" the court "rob[bed]" the relevant language of any independent meaning. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-339 (1979). The court compounded that error by also assuming that it could treat this short set of phrases as a "string of statutory terms" from which one can derive a single and narrow theme. *See Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288-289 (2010).

Nor did the Fifth Circuit's decision offer any reason to conclude that a virus that first appeared in the United States last year is not a "new hazard." The court's sole rationale was to cite a sentence in a brief where OSHA suggested that employers'

statutory duty to furnish safe workplaces "free from recognized hazards," 29 U.S.C. § 654(a)(1), would apply to COVID-19. Slip op. 10. But a hazard can be both "recognized" and "new." Indeed, to have evidence about a grave danger, a hazard must be recognized in some sense. And "by any measure," COVID-19 "is a new hazard"—there were no cases in the United States until just last year, and since June 2021, "the risk posed by COVID-19 has changed meaningfully." Pmbl.-61408. The recent and "rapid rise to predominance of the Delta variant" has meant "increases in infectiousness and transmission" and "potentially more severe health effects." Pmbl.-61409-12, 61431.

Even if Congress's primary focuses were not viruses or were risks "particular to [a] workplace," slip op. 9, it would be improper to "rewrite the statute so that it covers only what [courts] think is necessary to achieve what [they] think Congress really intended," *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010). Congress did not limit OSHA's authority to addressing that subset of grave dangers. Statutes "often go beyond the principal evil [targeted by Congress]," and "it is ultimately the provisions of our laws" that govern. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Those principles are particularly applicable here, where the provision at issue exists to address new or evolving dangers, and "the presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions," Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012).

**2.** Contrary to the Fifth Circuit's premise, moreover, COVID-19 *is* a particularly acute workplace hazard. *See* Pmbl.-61511 (noting "the unique occupational safety and health dangers presented by COVID-19"). The nature of workplaces is that employees come together in one place for extended periods and interact, thus risking workplace transmission of a highly contagious virus. Pmbl.-61411-17. While at work, "workers may have little ability to limit contact with," and possible exposure from, "coworkers, clients, members of the public, patients, and others." Pmbl.-61408. It is therefore unsurprising that OSHA identified workplace "clusters" and "outbreaks" of the COVID-19 virus, and presented significant "evidence of workplace transmission." Pmbl.-61411.

The idea that workplace hazards include diseases that exist outside of the workplace is hardly novel. As exemplified by famous outbreaks of tuberculosis and smallpox in factories, workplace dangers have long been understood to include the dangers of contracting communicable diseases as a result of being in close proximity to other employees. *See also, e.g.,* Danovaro-Holliday et al., *A Large Rubella Outbreak with Spread from the Workplace to the Community*, 284 JAMA 2733, 2739 (2000) (documenting rubella spread in meatpacking plants).

As the statutory text confirms, OSHA may promulgate standards for both "employment and *places of employment*." 29 U.S.C. § 652(8) (emphasis added). When drafting the OSH Act, Congress was focused on ensuring that employees can work in a safe and healthy "environment." H.R. Rep. No. 91-1291, at 14 (1970). That

environment includes "the air we breath[e] at work" where "over 80 million workers spend one-third of their day." *Id.* OSHA has required precautions for bloodborne pathogens, which can be contracted outside the workplace, and has long imposed workplace sanitation and fire rules, even though such concerns are not workplace-specific. Pmbl.-61407-08, *see, e.g.*, 29 C.F.R. §§ 1910.141, 1926.51 (general sanitation rules); *id.* §§ 1910.155-.165 (general fire prevention). The Fifth Circuit's decision, by contrast, would arbitrarily prohibit OSHA from addressing agents or hazards that are "widely present in society," slip op. 9, even where, as here, the agents or hazards spread—and create grave danger—inside the workplace.

**3.** The Fifth Circuit's interpretation also cannot be reconciled with congressional approval of OSHA's authority to address viruses. A separate provision of the OSH Act expressly indicates that OSHA can require "immunization," including to "protect[] the health or safety of others," 29 U.S.C. § 669(a)(5)—a provision premised on OSHA's authority to protect employees from communicable diseases. In addressing bloodborne pathogens, OSHA sought comment on a proposed standard to reduce employee exposure to, among other things, the Hepatitis B virus. *See Occupational Exposure to Bloodborne Pathogens*, 54 Fed. Reg. 23,042, 23,134-35 (May 30, 1989). Congress subsequently directed that, if the agency did not promulgate a final standard by a date certain, "the proposed standard on occupational exposure to bloodborne pathogens as published in the Federal Register on May 30, 1989 (54 FR 23042) [would] become effective as if such proposed standard had been promulgated as a final standard by the

Secretary of Labor." Pub. L. No. 102-170, tit. I, § 100(b), 105 Stat. 1107, 1113-1114 (1991). And Congress explained that OSHA would be "acting under the Occupational Safety and Health Act of 1970." *Id.* at 1113. This legislative action illustrates Congress's understanding that OSHA has authority to issue standards addressing workplace exposure to viruses. *See* Pmbl.-61407; *see also Branch v. Smith*, 538 U.S. 254, 281 (2003) (opinion of Scalia, J.) (statutes must be understood "in the context of the *corpus juris* of which they are a part").

Even if there were some statutory ambiguity, this Court should defer to OSHA's reasonable interpretation of the statute. *See M.L. Johnson Family Props., LLC v. Bernhardt*, 924 F.3d 842, 848 (6th Cir. 2019); *see also City of Arlington v. FCC*, 569 U.S. 290, 296-297 (2013) ("a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority"). OSHA's regulations—including one promulgated less than ten years after enactment of the OSH Act—have consistently indicated that viruses are physically harmful agents within the meaning of the Act, *see, e.g.*, 29 C.F.R. § 1910.1020(c)(13) (defining "[t]oxic substance or harmful physical agent" to include any "biological agent (bacteria, virus, fungus, etc.)"), and that OSHA has authority to address dangers in the workplace that also exist outside of the workplace, *see, e.g.*, 29 C.F.R. §§ 1910.141, 1926.51, 1910.155-.165. OSHA's application of these well-worn understandings to a particularly acute workplace danger created by a virus is a straightforward application of the statutory text. But if there were any doubts, OSHA's interpretation is due substantial deference.

### C. The Fifth Circuit's Discussion Of "Constitutional Concerns" Was Mistaken

The Fifth Circuit mistakenly concluded that imposing a rule to prevent the transmission of a deadly virus in America's workplaces "raises serious constitutional concerns" and that the OSH Act should therefore be limited to avoid that result. Slip op. 16-18. The constitutional claims are meritless and provide no basis "to rewrite" the Act's unambiguous grant of authority to address dangers to employees in the workplace. *Salinas v. United States*, 522 U.S. 52, 59-60 (1997) (quotation marks omitted).

**1.** Requiring businesses to take steps to protect employees from workplace dangers does not "exceed[] the federal government's authority under the Commerce Clause." Slip op. 16-17. Congress has long regulated companies engaged in interstate commerce in a variety of ways (for example, under Title VII and the Fair Labor Standards Act), and the Supreme Court has upheld such regulations of employment conditions as within Congress's commerce power, *see, e.g.*, *United States v. Darby*, 312 U.S. 100, 123-125 (1941). The OSH Act permits OSHA to issue "standards applicable to businesses affecting interstate commerce," 29 U.S.C. §§ 651(b)(3), 652(3), (5), in order "to assure . . . safe and healthful working conditions" for the nation's workers, *id.* § 651(b). The Standard satisfies those criteria and reflects congressional findings that "illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce." *Id.* § 651(a); *see also* Pmbl.-61473-74 (discussing cost of absenteeism to employers).

The Fifth Circuit erred in reasoning that because "remain[ing] unvaccinated and forgo[ing] regular testing" is in some sense "inactivity," the federal government cannot impose workplace safety rules requiring these precautions. Slip op. 16. The Standard regulates employers who have affirmatively chosen to participate in interstate commerce. The Standard also establishes conditions for employees' safe participation in employment—an economic activity. Like many federal laws that regulate business conduct, the Standard here prescribes rules concerning how to engage in that commercial activity, and those rules sometimes require taking actions. *See National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) (opinion of Roberts, C.J.) ("the power to regulate assumes there is already something to be regulated"). Thus, federal laws can require businesses (and their employees) to serve patrons regardless of race, *see Katzenbach v. McClung*, 379 U.S. 294, 298-299, 303-304 (1964); require employers and employees to fill out all sorts of paperwork; establish job qualifications such as education, licensing, or health requirements, *see, e.g.,* 46 C.F.R. § 10.301 *et seq*. (requiring medical exams for pilots); and impose workplace safety and health standards that range from having to put on special safety gear to "ensur[ing] that employees wash hands," 29 C.F.R. § 1910.1030(d)(2)(v)-(vi).

An employee may view her "choice" not to engage in these required steps as "noneconomic inactivity." Slip op. 16. But the rules govern whether and how individuals may engage in an economic employment activity and are accordingly well within the commerce power. This is particularly clear with respect to a rule that not

only requires workplace health and safety precautions but that does so to stem the workplace transmission of a communicable disease that is devastating workers and has profound impacts on the national economy. *See Darby*, 312 U.S. at 121; *see also United States v. Comstock*, 560 U.S. 126, 142 (2010); Tr. of Oral Arg. at 30, *United States v. Comstock*, 560 U.S. 126 (2010) (No. 08-1224) (Justice Scalia: "[I]f anything relates to interstate commerce, it's communicable diseases, it seems to me.").[8]

**2.** The Fifth Circuit was similarly mistaken that "concerns over separation of powers principles" separately "cast doubt" on the Standard. Slip op. 17. The decisions cited by the court interpreted ambiguous statutory language based on assumptions about when Congress is likely to delegate to an agency a decision "of vast 'economic and political significance.'" *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). This Court need not consider those assumptions here because the statutory text is unambiguous and limited to addressing grave dangers to employees in the workplace. Like many other areas of regulation, workplace-safety regulations may affect many Americans and cost large amounts of money in the aggregate. *See* slip op. 18; *see also*

---

[8] The Fifth Circuit similarly erred in characterizing the Standard as "commandeer[ing]" employers. Slip op. 17. Even though vaccination or testing have benefits outside of the workplace and may occur outside of the workplace, these requirements are designed to ensure the health and safety of employees in the workplace by ensuring employees do not transmit a deadly virus to each other. To the extent that the Fifth Circuit's position reduces to its repeated assertion that the agency's determinations were "pretextual" (*id.* at 12) and that the rule's "true purpose" was "not to enhance workplace safety" (*id.* at 15), those inferences are unsupported and incorrect. *See* p. 39 *infra*.

*American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 519-520 (1981) (explaining that Congress recognized as much when passing the OSH Act). But the fact that a federal regulation would have nationwide effect and may require compliance costs is unremarkable; those are common to many forms of federal regulation and do not require some sort of congressional clear statement or compel a circumscribed interpretation of a deliberately broad congressional grant.

**3.** Equally misplaced is the Fifth Circuit's passing reference to the nondelegation doctrine. Slip op. 6. "Only twice in this country's history" has the Supreme Court "found a delegation excessive—in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.); *see also Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*, 5 F.4th 666, 672 (6th Cir. 2021) ("unfettered" agency power "could raise a nondelegation problem"). Statutory grants of authority are valid so long as they provide an "intelligible principle." *Gundy*, 139 S. Ct. at 2123. Section 655(c)(1) provides clear guidelines that easily exceed this threshold. It permits only emergency standards necessary to protect employees from the grave danger of new hazards or toxic or physically harmful substances or agents. Courts have had no trouble evaluating prior emergency standards according to those requirements. *See, e.g.*, *Dry Color Mfrs. Ass'n v. Department of Labor*, 486 F.2d 98, 107 (3d Cir. 1973) (vacating standard with respect to two of fourteen carcinogens); *see also Industrial Union*, 448 U.S. at 640 n.45, 646 (plurality op.) (reading a neighboring provision in terms similar to Section 655(c) and thereby avoiding

nondelegation question). The Supreme Court has consistently "upheld even very broad delegations," including authorities "to regulate in the 'public interest,'" "to set 'fair and equitable' prices," and "to issue whatever air quality standards are 'requisite to protect the public health.'" *Gundy*, 139 S. Ct. at 2129. The narrower delegation in Section 655(c)(1) provides a far more circumscribed standard limited to a defined category of risks.

### D. OSHA Had Ample Basis For Its Determinations

The Fifth Circuit questioned OSHA's analysis in numerous respects, but the court did not meaningfully address OSHA's comprehensive explanations, and it disregarded the deference owed to the agency's evidence-based determinations. *See* 29 U.S.C. § 655(f) ("The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole.").

**1.** The Fifth Circuit mistakenly suggested that the Standard cannot be necessary to protect employees from a grave danger because OSHA did not act earlier. *See* slip op. 7 & n.11. Dangers can evolve, as can the need for a standard and the ability to address dangers effectively. That is what happened here, as OSHA explained. OSHA can also obtain "new information" or respond to "new awareness." *Asbestos Info. Ass'n/N. Am. v. OSHA*, 727 F.2d 415, 423 (5th Cir. 1984). And, of course, to conclude "that because OSHA did not act previously it cannot do so now" would "only compound[]" any prior "failure to act." *Id.* Here, OSHA described the "extraordinary and exigent circumstances" warranting the Standard, Pmbl.-61434, including that

"workers are being hospitalized with COVID-19 every day, and many are dying," Pmbl.-61549.

a. When the pandemic began, "scientific information about the disease" and "ways to mitigate it were undeveloped." Pmbl.-61429. OSHA crafted workplace guidance but declined to issue an emergency temporary standard "based on the conditions and information available to the agency at that time," including that "vaccines were not yet available" and that it was unclear if "nonregulatory" options would suffice. Pmbl.-61429-30.

OSHA explained that it acted now because voluntary measures proved ineffective, the COVID-19 virus grew more virulent, and fully approved vaccines and tests are increasingly available. Prior, nonregulatory options have proven "inadequate," and due to "rising 'COVID fatigue,'" voluntary precautions are becoming even less common. Pmbl.-61444. Meanwhile, since June 2021, "the risk posed by COVID-19 has changed meaningfully." Pmbl.-61408. As more employees returned to workplaces, the "rapid rise to predominance of the Delta variant" meant "increases in infectiousness and transmission" and "potentially more severe health effects." Pmbl.-61409-12, 61431. At the same time, vaccines are now widely available, Pmbl.-61450; large-scale studies have further confirmed the "power of vaccines to safely protect individuals," including from the Delta variant, Pmbl.-61431; "the FDA granted approval" (rather than Emergency Use Authorization) to one vaccine on August 23, *id.*; FDA has "authorized more than 320 tests and collection kits," Pmbl.-61452; and OSHA

determined that "the increasing rate of production" will ensure sufficient supply before the "testing compliance date," *id.* Far from calling into question OSHA's assessments, the timing reflects OSHA's determination, based on detailed analysis, that this response is needed now to address an ongoing grave danger in the workplace.[9]

b. The Fifth Circuit misunderstood OSHA's decision not to issue an emergency standard in May 2020 and erred by discounting the agency's later, comprehensive analysis based on significant new information. *See* slip op. 2, 8 n.14, 12, 13-15. The court primarily relied on a May 2020 response to an emergency mandamus petition, where OSHA described its ongoing analysis and its view that a standard was not necessary at that time given voluntary precautions and employers' statutory duty to protect employees. *See* Pmbl.-61430 (describing OSHA's thinking at the time). OSHA stressed the many "uncertainties" and reserved the ability to change its approach "when critical new . . . information is learned." Mand. Opp. 29-30. With little information available in May 2020, OSHA was concerned about acting on "incomplete or ultimately inaccurate information" and unintentionally issuing a standard that proved

---

[9] The fact that the agency took less than "two months" to finalize the Standard after the President's announcement, slip op. 7 (emphasis omitted), reflects great expedition. OSHA undertook a comprehensive study of the danger to employees of COVID-19 in the workplace and ways to address it and then detailed its explanations and fact-based determinations in 150 pages of analysis. The Standard's staggered compliance dates, *see id.* at 7 n.11, simply allow employers time to familiarize themselves with the requirements and take preparatory steps. Pmbl.-61549.

"counterproductive." Mand. Opp. 30.[10] None of that bears on the current Standard. Today, far more is understood about the virus and how it spreads. OSHA's concern about crafting a "'one-size-fits-all' response," Mand. Opp. 31, predated the existence of precautions, such as vaccines and easily accessible testing, that can now be used in any workplace.

The Fifth Circuit similarly erred by relying (slip op. 8 n.14) on OSHA's May 2020 response to the mandamus petitioners' request for "a sweeping infectious disease [emergency temporary] standard beyond COVID-19," Mand. Opp. 33. OSHA explained that the requester had provided insufficient evidence of "grave danger" for a generic and "undefined category of 'infectious diseases.'" *Id.* Only with respect to that generic category did OSHA state that "[t]he OSH Act does not authorize OSHA to issue sweeping health standards" without notice and comment "to address entire classes of known and unknown infectious diseases on an emergency basis." Mand. Opp. 33-34; *see also* Sweatt Letter 2 (similar). Here by contrast, the Standard does not address the danger of infectious diseases writ large. Rather, OSHA examined the specific and

[10] A May 2020 letter, relied on by the Fifth Circuit, similarly explained that OSHA's response to the workplace danger of COVID-19 was "evolving" and that it might be "counterproductive" to establish a "standard at this juncture." Letter from Loren Sweatt, Principal Deputy Assistant Sec'y, OSHA, to Richard L. Trumka, President, AFL-CIO 3, 5 (May 29, 2020) (Sweatt Letter) (cited at slip op. 15).

present danger posed by COVID-19 to employees in the workplace and determined the means to address this threat.[11]

**2.** The Fifth Circuit also posited that because OSHA did not immediately extend the Standard to employers with fewer than 100 employees, OSHA must have a "true purpose" other than "workplace safety." *See* slip op. 15; *see also id.* at 6-7. This disregards OSHA's rationale and fails on its own terms.

Due to the "unique" and exigent "occupational safety and health dangers presented by COVID-19, OSHA is "proceeding in a stepwise fashion" by applying the Standard to "companies that OSHA is confident will have sufficient administrative systems in place to comply quickly." Pmbl.-61403. OSHA is concurrently obtaining "additional information to determine whether to adjust the scope of the ETS to address smaller employers." *Id.* OSHA's decision, in other words, does not suggest doubt about the grave danger posed by COVID-19 or the necessity of the Standard—it demonstrates OSHA's need to act urgently.

---

[11] The record similarly belies the Fifth Circuit's suggestion that OSHA failed to address reliance interests. Slip op. 12. The court did not state how any petitioner relied on OSHA's prior decisions to monitor an evolving situation or what petitioners would have done differently. OSHA, in any event, explained that any "reliance would have been unjustified" where OSHA indicated that its decisions were predicated on "conditions and information available to the agency at that time" and were "subject to change." Pmbl.-61430. OSHA further noted that even if there were such (unreasonable) reliance interests, they "cannot outweigh the countervailing urgent need to protect" unvaccinated workers "from the grave danger posed by COVID-19." *Id.*; *see Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).

The government "need not address all aspects of a problem in one fell swoop" even under strict scrutiny. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015). Here, OSHA's limited data about smaller employers meant that the agency could not quickly satisfy its obligation to find that the Standard was feasible for those employers. *See* Pmbl.-61403, 61511-13 (analyzing the issue). But OSHA explained that "[t]he employees of larger firms should not have to wait for the protections of this standard while OSHA takes the additional time necessary to assess the feasibility of the standard for smaller employers." Pmbl.-61511; *see also* Pmbl.-61512 (citing evidence that "larger employers are more likely to have many employees gathered in the same location" and have "larger" and "longer" outbreaks). Therefore, while simultaneously seeking comment and undertaking further study on smaller employers, OSHA "act[ed] to protect workers now in adopting a standard that will reach two-thirds of all private-sector workers in the nation." Pmbl.-61403.

OSHA's decision not to extend the Standard to smaller employers at this time does not undermine its considered analysis of the grave danger to employees and need for this Standard. Indeed, even if OSHA were not "proceeding in a stepwise fashion" here, Pmbl.-61403, that would not undermine such determinations. Laws frequently include exemptions for small employers, and such provisions do not call into question the important interests being served. Title VII, for example, which prohibits certain forms of discrimination in the workplace, originally exempted employers with fewer than 25 employees, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 505 & n.2 (2006), and

currently does not apply to the millions of employers with fewer than 15 employees, *see* 42 U.S.C. § 2000e(b).[12] But that does not call into question the extraordinary importance of prohibiting discrimination in the workplace. The same is true for the critical workplace health risks necessitating the Standard.

**3.** The Fifth Circuit's additional suggestions that COVID-19 does not pose a grave danger or that the Standard's means of addressing that danger are not necessary also lack merit.

a. The Fifth Circuit focused on several features of COVID-19 in suggesting that it does not pose a grave danger. *See* slip op. 11. None calls into question the extraordinary, present danger that COVID-19 poses to employees in the workplace.

The court observed that "the effects of COVID-19 may range from 'mild' to 'critical.'" Slip op. 11. The same is true of deadly poisons or carcinogens.[13] A "grave

---

[12] *See also, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, 81 Stat. 605, the statute now governs employers with 20 or more employees); Americans With Disabilities Act, 42 U.S.C. § 12111(5)(A) (employers with 15 or more employees).

[13] Citing *In re International Chem. Workers Union*, 830 F.2d 369, 371 (D.C. Cir. 1987), the Fifth Circuit stated that "OSHA itself once concluded 'that to be a "grave danger," it is not sufficient that a chemical, such as cadmium, can cause *cancer* or *kidney damage* at a high level of exposure.'" Slip op. 11. The next sentence in the quoted opinion explained that "it is necessary, in OSHA's view, that a finding of 'grave danger' to support an ETS be based upon exposure in actual levels found in the workplace, [and] OSHA concluded that the currently available data was not sufficiently definitive on actual exposure levels to justify an ETS." 830 F.2d at 371. In other words, the theoretical possibility of danger at a high enough level of exposure is insufficient if that level of exposure is not realistic in the workplace. Here, however, OSHA painstakingly

danger" includes "the danger of incurable, permanent, or fatal consequences to workers." *Florida Peach Growers Ass'n*, 489 F.2d at 132. The existence of a grave "*danger*," by definition, does not mean that the worst-case scenario is certain to befall every employee. OSHA properly explained that the grave danger "is clear" because "the mortality and morbidity risk to employees from COVID-19 is so dire." Pmbl.-61408; *see* Pmbl.-61410-11, 61424. OSHA found that "[u]nvaccinated workers are being hospitalized with COVID-19 every day, and many are dying." Pmbl.-61549; *see* Pmbl.-61408 (the Standard will "save over 6,500 worker lives and prevent over 250,000 hospitalizations over the course of the next six months"). "Even for those who survive a SARS-CoV-2 infection, the virus can cause serious, long-lasting, and potentially permanent health effects." Pmbl.-61424.

The decline in national cases since the pandemic's most recent peak, *see* slip op. 11, says little about the current state of workplace exposure and transmission. And the fact that case numbers have been higher at points in the past says nothing about whether there is a present, grave danger. OSHA considered "variability in infection rates" and that "curves of new infections and deaths can bend down after peaks" and "often reverse course." Pmbl.-61431. Thus, even assuming that "varied" "spread," slip op. 11, is representative of workplace transmission, OSHA tracked recent changes in national case rates and explained that "[t]he most recent 7-day moving average of

---

catalogued significant workplace exposure and transmission that is causing serious illness and death.

reported cases, while lower than the peak in late August and early September, is still over 85,000." Pmbl.-61431. OSHA also observed that "many northern states are currently experiencing increases in their rate of new cases" and that this could "presage a greater resurgence in cases this winter." *Id.*

Similarly, current vaccination statistics, slip op. 11, do not address the danger to the many employees who are not fully vaccinated. Much as a grave danger exists even if some employees already wear appropriate protective gear, a grave danger exists here even though some employees are already taking precautions. The agency found that as a result of widespread workplace exposure, large numbers of employees are becoming seriously ill, and many are dying. No more is required.

b. The Fifth Circuit also appeared to question whether the vaccination or masking-and-testing options are sufficiently effective because they cannot "prevent . . . employees from spreading the virus." Slip op. 15 n.19. OSHA explained that vaccination serves two related functions. First, vaccines largely prevent any virus transmitted in the workplace from causing serious illness. Studies have confirmed the "power of vaccines to safely protect individuals," including from the Delta variant. Pmbl.-61431, 61450. Second, vaccines reduce the likelihood of employees bringing the virus into the workplace and transmitting the virus to other employees. *See, e.g.*, Pmbl.-61403, 61418-19, 61435, 61438, 61528-29. No precaution is 100% effective. But this dual mechanism makes vaccines "the most effective method of protecting workers from COVID-19." Pmbl.-61509.

Because "unvaccinated employees" can potentially "spread[] the virus in between weekly tests," slip op. 15 n.19, testing is used in conjunction with wearing a face covering. OSHA explained that testing "will not prevent an unvaccinated worker from exposing others at the workplace if the worker becomes infected and reports to the workplace in between their weekly tests." Pmbl.-61438-39. Nevertheless, "requiring unvaccinated workers to wear face coverings in most situations when they are working near others will further mitigate the potential for unvaccinated workers to spread the virus at the workplace." Pmbl.-61439.

c. The other "miscellaneous considerations" identified by the Fifth Circuit also do not call OSHA's reasoned determinations into question. *See* slip op. 16. The court cited OSHA's discussion of a June 2021 standard for healthcare workers, which established "a comprehensive infection prevention program for the specific healthcare settings to which [that healthcare standard] applied." Pmbl.-61434. That standard was "carefully tailored to the healthcare workplaces it covers," and imposed "a multi-layered suite of protections" such as special personal protective equipment, disinfection, and ventilation rules. Pmbl.-61515; *see, e.g.*, 29 C.F.R. § 1910.502(b), (f). The possibility that, if given more time, OSHA could devise more elaborate and tailored standards for different settings, *see* Pmbl.-61434-35, 61437-38, does not mean that this Standard is an impermissible "stop-gap" or otherwise suggest that OSHA erred when determining that this Standard is necessary to address the present, grave danger. *See* slip op. 16. The whole point of issuing an emergency temporary standard is "to provide immediate

protection," and as a result, such standards "may necessarily be somewhat general." *Dry Color*, 486 F.2d at 102 n.3, 105.

The Fifth Circuit was similarly mistaken when it stated that a Standard that is designed to prevent thousands of employee deaths and hundreds of thousands of hospitalizations, Pmbl.-61408, "flunks a cost-benefit analysis." Slip op. 16. The Supreme Court has recognized that "Congress uses specific language when intending that an agency engage in cost-benefit analysis." *American Textile Mfrs.*, 452 U.S. at 510-511. Here, the Fifth Circuit did not identify any text directing OSHA to do so—the relevant language is calibrated to measures "necessary to protect employees" from "grave danger." 29 U.S.C. § 655(c)(1). Even the case cited by the court confirms that OSHA need not conduct a "formal cost-benefit analysis" before issuing an emergency temporary standard. *Asbestos*, 727 F.2d at 423 n.18; *see id.* (reasoning that it is "unlikely" that "the agency would have time to conduct such an analysis" to respond to emergencies). In any event, OSHA's detailed economic analysis—which the Fifth Circuit never cited or discussed—presented "estimates of the costs and impacts" of the rule. Pmbl.-61549; *see* Pmbl.-61475-95. OSHA concluded that implementation is feasible for covered employers. *See id.* The implementation costs are particularly reasonable in relation to the substantial benefits that the Fifth Circuit failed to acknowledge. *See* Pmbl.-61408, 61460 n.22; *see also* OSHA, Health Impacts of the COVID-19 Vaccination and Testing ETS (2021) (Health Impacts).

**4.** The Fifth Circuit also suggested that given employees' varied ages, prior infections, and differences between workplaces, OSHA could not issue any generally applicable standard. *See* slip op. 6, 8, 10-11, 13. These conclusions disregard OSHA's considered explanation and supporting evidence.

a. The Fifth Circuit erred in suggesting that it is unnecessary for people who were previously infected with COVID-19 to get vaccinated or mask and test because they are "naturally immune." *See* slip op. 8, 13. OSHA described several studies showing that "[a] considerable number of individuals who were previously infected with SARS-CoV-2 do not appear to have acquired effective immunity to the virus." Pmbl.-61421. OSHA also discussed "some evidence that infection-acquired immunity has the potential to provide a significant level of protection," Pmbl.-61422 (though less protection than for those who are vaccinated), but explained that "it is difficult to tell, on an individual level, which individuals" have attained that level of protection, Pmbl.-61421; *see* Pmbl.-61423 (existing "tools cannot determine what degree of protection [that] particular individual has"). OSHA further explained that these studies suffered from "selection bias" by generally ignoring "people who had mild COVID-19 infections," which are known to confer far less immunity. Pmbl.-61422-23. And these studies had no "established thresholds to determine full protection from reinfection or even a standardized methodology to determine infection severity or immune response." Pmbl.-61422.

b. The Fifth Circuit also focused on the idea that younger employees may face little danger. *See* slip op. 8, 13. But OSHA analyzed danger to employees of all ages. *See, e.g.*, Pmbl.-61410, 61424. OSHA cited evidence that unvaccinated adults under 50 face a much higher risk of death or hospitalization than vaccinated adults of the same age, particularly with the Delta variant. *See, e.g.*, Pmbl.-61418 ("For unvaccinated 18 to 49 year olds, the risk of hospitalization was 15.2 times greater, and the risk of death was 17.2 times greater, than the risks for vaccinated people in the same age range."). And OSHA incorporated its recent analysis for a standard governing healthcare workers, Pmbl.-61410 & n.9, where OSHA discussed the hospitalization rate in "people between the ages of 18 and 49," 86 Fed. Reg. 32376, 32384 (June 21, 2021), and the incidence of COVID-19 causing strokes, "even in young people," *id.* at 32385. Employees of all ages also have various comorbidities and other risk factors for severe COVID-19 infections. *See, e.g.*, Pmbl.-61410.

And while, holding all other risk factors constant, a "28-year-old" may be "less vulnerable" than a "62-year-old," slip op. 13, that observation does not take account of how the Standard operates. Even if some individual employees are unlikely to suffer severe health consequences if infected, OSHA adopted the Standard in part to prevent employees from transmitting the virus to other employees—a risk that is not age dependent. *See, e.g.*, Pmbl.-61403, 61418-19, 61435, 61438; *see also, e.g.*, Pmbl.-61418 (discussing transmission studies, including one of populations with mean ages of 31 and 44, and another of two populations with median ages of 38); Pmbl.-61412-14

(discussing outbreaks in schools, colleges, restaurants, nightclubs, fitness centers, and other settings with younger and mixed-age populations).

c. The Fifth Circuit similarly disregarded OSHA's discussion of dangers in varied worksites and industries. *See* slip op. 6, 8, 13. Based on evidence about virus-transmission rates, OSHA exempted employees who work alone, remotely, or exclusively outdoors. Pmbl.-61419. OSHA included other workers, explaining that "employees can be exposed to the virus in almost any work setting" and that even if sometimes physically distanced, employees routinely "share common areas like hallways, restrooms, lunch rooms, and meeting rooms" and are at risk of infection from "contact with coworkers, clients, or members of the public." Pmbl.-61411-12. Based on its analysis of the record evidence, OSHA reasonably concluded that the Standard was necessary to protect unvaccinated workers in "a wide variety of work settings across all industries." Pmbl.-61412.

OSHA analyzed peer-reviewed studies and data collected by health departments and found that "exposures to SARS-CoV-2 happen regularly in a wide variety of different types of workplaces." Pmbl.-61411. OSHA reviewed "studies and reports" of outbreaks in "a wide range of workplaces" across various industries. Pmbl.-61412-15. These included "service industries (*e.g.*, restaurants, grocery and other retail stores, fitness centers, hospitality, casinos, salons), corrections, warehousing, childcare, schools, offices, homeless shelters, transportation, mail/shipping/delivery services, cleaning services, emergency services/response, waste management, construction,

agriculture, food packaging/processing, and healthcare." Pmbl.-61412. "Deaths" were "reported in many" of these outbreaks. *Id.* Just to offer one (of many) examples: OSHA reviewed one state health department's reports on "5,247 outbreaks in approximately 40 different types of non-healthcare work settings." *Id.* OSHA also considered changes over time, such as in a State where, "in July of 2021, the number of cases associated with workplace clusters began increasing in several different types of work settings." Pmbl.-61413. And OSHA reviewed studies that "analyzed death records" and evaluated "how mortality rates among individuals in various types of workplaces had changed during the pandemic." Pmbl.-61415. Although some industries showed higher spikes than others, these studies also suggested significant transmission across workplaces. *See id.*

While an employee who spends much of his time alone likely has less risk of transmission than an employee who is constantly surrounded by others, *see* slip op. 13, OSHA also explained the opinion of public-health experts that "fifteen minutes" of exposure is more than sufficient for transmission to occur, Pmbl.-61409 (citing CDC guidance on "close contacts"); *see also* Pmbl.-61538 (citing a study that identified multiple infections caused by less than 15 minutes of exposure). And OSHA incorporated its recent analysis for a standard governing healthcare workers, Pmbl.-

61410 & n.7, which described a study showing that "[i]nfections have been observed with as little as five minutes of exposure in an enclosed room." 86 Fed. Reg. at 32393.[14]

d. In all events, varied risks do not prohibit OSHA from addressing a grave danger. The fact that "COVID-19 is more dangerous to *some* employees than to *other* employees," slip op. 13, does not imply that no one faces a grave danger. Nor can a court's view of "reality and common sense," *id.*, supplant an agency's reasoned and expert analysis. Consistent with the ordinary rule that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), OSHA's determinations are "conclusive if supported by substantial evidence *in the record* considered as a whole," 29 U.S.C. § 655(f) (emphasis added). "It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities" to an ultimate "conclusion." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). OSHA fulfilled its obligation by reviewing available evidence, acknowledging where scientific evidence is not uniform, and explaining its analysis. *See National Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 751-752 (D.C. Cir. 2011); *see also* H.R. Rep. No. 91-1291, at 18

[14] If an employee works exclusively alone, other than "de minimis use of indoor spaces" with other people, such as a "bathroom or an administrative office," then that employee need not take the required precautions. Pmbl.-61516.

(warning that the Secretary should not be "paralyzed by debate surrounding diverse medical opinions").

Workplace standards also need not operate on an employer-by-employer or employee-by-employee basis. The Act directs OSHA to issue an emergency temporary standard if OSHA "determines" that "employees are exposed to grave danger" and the standard "is necessary to protect employees from such danger." 29 U.S.C. § 655(c)(1). The Act does not require OSHA to determine that "each" employee is exposed to grave danger, with the standard necessary to protect "each" employee from such danger. *Id.*; *see also id.* § 655(d) (authorizing employer-specific variances). No rule could operate that way. Workplaces may have a mix of employees who had prior COVID-19 infections of varied severity at varied times with varied forms of confirmation. Workplaces ordinarily have people of varied ages and other risk factors that are also correlated with severe COVID-19 cases. And workplaces can have a nearly infinite number of layouts, ventilation systems, traffic patterns, and typical employee habits. OSHA "cannot," for example, be "required to proceed workplace by workplace," *American Dental Ass'n v. Martin*, 984 F.2d 823, 827-828 (7th Cir. 1993), or "be expected to conduct on-the-spot investigations," *Dry Color,* 486 F.2d at 102 n.3. Nor can OSHA meet the impossible burden of finding definitive proof that COVID-19 is present in every workplace. *Cf.* slip op. 10 (stating that "OSHA cannot possibly show that every workplace covered by the Mandate currently has COVID-positive employees"). Such a requirement would

be particularly anomalous in the context of emergency standards under Section 655(c), which exists "to provide immediate protection." *Dry Color,* 486 F.2d at 105.

**5.** Finally, the Fifth Circuit's view (*see* slip op. 7-8 & n.13, 12 & n.18, 15) that OSHA's analyses are "pretextual" is incorrect and ignores the comprehensive administrative record here. Judicial review should be based on an agency's contemporaneous explanation in light of the existing administrative record, *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978), not on cherry-picked public statements outside that record such as a White House official's "retweet" of a reporter's tweet, *see* slip op. 7 & n.13, 12 n.18. The fact that the President has expressed significant concern about the ongoing pandemic, including low vaccination rates, and has described the broader response to this pandemic, *see* slip op. 7 & n.11, does not in any way undermine the agency's reasonable conclusions. Indeed, "[i]t is hardly improper" for officials "to come into office with policy preferences" and to work with agency staff to evaluate the "basis for a preferred policy." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2574 (2019); *see Jagers v. Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185-1186 (10th Cir. 2014). And it "would eviscerate the proper evolution of policymaking were [courts] to disqualify every [official] who has opinions on the correct course of his agency's future actions." *Air Transp. Ass'n of Am., Inc. v. National Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011) (quotation marks omitted). Here, OSHA amply explained its conclusions in an exhaustive analysis.

## II. The Balance Of Equities Also Precludes The Extraordinary Relief Petitioners Seek

Because petitioners cannot establish a likelihood of success on the merits, the stay should be dissolved. *See Nken*, 556 U.S. at 433-434; *id.* at 438 (Kennedy, J., concurring); *Luxshare, Ltd. v. ZF Auto. US, Inc.*, 15 F.4th 780, 783 (6th Cir. 2021). Petitioners also have not shown any injury that outweighs the injuries to the government and the public interest and that warrants staying a Standard that will save thousands of lives.

**A.** Most fundamentally, the harms to the government and the public—which merge here, *see Nken*, 556 U.S. at 435—of continuing the stay would be enormous. Delaying this Standard would endanger many thousands of people and would likely cost many lives per day. COVID-19 has already killed over 750,000 people in the United States and caused "serious, long-lasting, and potentially permanent health effects" for many more. Pmbl.-61424. And there is extensive evidence of "workplace transmission." Pmbl.-61411. With the reopening of workplaces and the emergence of the highly transmissible Delta variant, the threat to workers is ongoing and overwhelming. *See* Pmbl.-61411-15. Workers "are being hospitalized with COVID-19 every day, and many are dying." Pmbl.-61549.

The Standard responds to these "extraordinary and exigent circumstances," Pmbl.-61434, and the Fifth Circuit's stay will likely cause significant harm. Even limiting its analysis to employees aged 18-64 who elect vaccination, OSHA estimated

that the Standard will "save over 6,500 worker lives and prevent over 250,000 hospitalizations" over a six-month duration. Pmbl.-61408; *see* Health Impacts. Accounting for workers aged 18-74, those estimates rise to 13,847 lives saved and 563,102 hospitalizations prevented—an average of roughly 77 lives and 3128 hospitalizations per day. Health Impacts 1. These estimates, moreover, do not include the long-lasting and serious health effects avoided. These figures also understate the impact of a stay because they estimate only the protection provided by vaccination to workers who become vaccinated—not the protection to unvaccinated workers when "vaccinated workers are less likely to spread the virus" or when other workers mask and test. Health Impacts 2; Pmbl.-61438-39.

The stay could also cause significant harm outside of the workplace. OSHA's estimates do not account for "avoided COVID-19 cases among family and friends that would occur due to exposure to an infected worker," diminished "transmission from employees to clients or other visitors," prevented breakthrough infections in vaccinated workers, and reduced infections in vaccinated employees "caused by non-workplace exposures." Health Impacts 2. And none of that includes the benefits from reducing strains on healthcare systems, slowing the emergence of new variants, and combatting the pandemic's ongoing effects on the economy. *Id.*

Simply put, delaying the Standard would likely cost many lives per day, in addition to large numbers of hospitalizations, other serious health effects, and tremendous expenses. That is a confluence of harms of the highest order. *See, e.g.*,

*Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) ("it doubtlessly advances the public interest to stem the spread of COVID-19"); *Does 1-6 v. Mills*, 16 F.4th 20, 32 (1st Cir. 2021). The Fifth Circuit did not dispute OSHA's estimates of the Standard's benefits. Rather, the court disregarded them altogether.

**B.** The Fifth Circuit instead declared that "a stay will do OSHA no harm whatsoever," and that "a stay is firmly in the public interest." Slip op. 20. The court based that determination on the unexplained assertion that, "[f]rom economic uncertainty to workplace strife, the mere specter" of the Standard "has contributed to untold economic upheaval in recent months." Slip op. 20. The court appears to have engaged in its own "evaluation of legislative facts," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981), and to have disregarded OSHA's detailed "economic analysis" of the Standard's "costs and impacts," including a detailed industry-by-industry assessment. Pmbl.-61459, 61475-95; *see Alliance of Nonprofit Mailers v. Postal Regulatory Comm'n*, 790 F.3d 186, 197 (D.C. Cir. 2015) (explaining that while courts should not be "a rubber stamp for agency actions," nor should they sit as a "peer review board for an academic journal of econometrics"). And while of course the public interest is served by "maintaining our constitutional structure," slip op. 20, that statement rested on the court's mistaken discussion of "constitutional concerns" that the court itself declined to embrace fully, *see* slip op. 16.

**C.** The Fifth Circuit's discussion of irreparable harm to the petitioners was similarly mistaken. Regulated parties face little prospect of injury until the Standard

takes full effect early next year. And the speculative compliance costs and similar harms asserted by regulated parties cannot overcome the extraordinary harms to the public interest detailed above.

**1.** The Fifth Circuit's mention of "the business and financial effects of a lost or suspended employee" did not cite any record evidence and is difficult to square with OSHA's comprehensive analysis of the impact on companies. Slip op. 19. OSHA addressed the potential for employee attrition and cited empirical data showing that "the number of employees" who ultimately refuse to comply with these kinds of required COVID-19 precautions has been "much lower than the number who claimed they might." Pmbl.-61475.[15] The Fifth Circuit made no mention of that analysis or the underlying evidence on which it was based. Nor did the court address the likely benefits to employers. Workplace COVID-19 outbreaks can force shutdowns and cause significant losses. *See, e.g.*, Pmbl.-61446. Even one-off cases can be costly and disruptive, and "reduced absenteeism due to fewer COVID-19 illnesses and quarantines" means savings for employers. Pmbl.-61474.

[15] The anecdotal evidence in the record before the Fifth Circuit does not call into question these estimates. For example, one stay motion was supported by five employee declarations stating that "I do not want to lose my job or be forced to give it up due to a federal COVID-19 vaccine mandate." BST Holdings Stay Mot., Ex. D ¶ 8, Ex. E ¶ 8, Ex. F ¶ 7, Ex. G ¶ 8, Ex. H ¶ 8. That identical statement does not account for accommodations, variances, or the fact that the Standard gives employers the choice to offer masking and testing.

The Fifth Circuit's description of other types of economic harm similarly missed the mark. The references to "compliance and monitoring costs" as well as "diversion of resources," slip op. 19, were again untethered to any evidence before the Court and in significant tension with OSHA's analysis of these issues. Based on a detailed economic analysis making several conservative assumptions, Pmbl.-61460-88, OSHA estimated a modest cost to employers of about $35 per covered employee—or $94 per covered unvaccinated employee, Pmbl.-61472, 61493. The court did not question or even acknowledge those figures. These types of "ordinary compliance costs," moreover, are "typically insufficient" to justify a stay. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (similar). And although the court suggested that a stay is warranted any time any compliance costs or financial penalties may not be recoverable from the government, slip op. 19, such a categorical rule would be "inconsistent with [the] characterization of [equitable] relief as an extraordinary remedy," *Winter*, 555 U.S. at 22. In any event, if the Standard were truly infeasible for a company's operations, it could seek a "variance." 29 U.S.C. § 655(d).

**2.** The Fifth Circuit also erred by declaring that the Standard "threatens to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)." Slip op. 18-19. The Standard does not require all employees to receive a vaccine. Employers are free to allow employees who choose not to be vaccinated to comply with the testing-and-masking requirements. Regardless

of which compliance option petitioners choose, employees may seek appropriate, individual accommodations. Pmbl.-61459, 61475 n.43.

The court also stated that an individual's "loss of constitutional freedoms" automatically "'constitutes irreparable injury.'" Slip op. 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But that argument at a minimum requires petitioners to have valid constitutional claims. And while the court appeared to endorse certain constitutional theories, it ultimately declined to pass upon those issues. *See id.* at 16. The court similarly erred by giving weight to the State petitioners' claimed interest in avoiding "federal overreach" into "health policy." *Id.* at 19. This interest rests on the meritless claim that the power to regulate interstate commerce does not authorize workplace safety rules that require employees to take action. In any event, "[t]he loss of First Amendment freedoms" and similar deprivation of individual rights, *id.* (quotation marks omitted), is different in kind from even the Commerce Clause and non-delegation principles that the court discussed. *Cf. Brown v. Secretary, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1225 (11th Cir. 2021) (rejecting "the notion that the 'violation of constitutional rights always constitutes irreparable harm'" except for "certain First Amendment and right-of-privacy claims"). Alleged constitutional violations cannot automatically entitle petitioners to "an extraordinary remedy." *Winter*, 555 U.S. at 22.

### III. If This Court Disagrees, The Stay Should Still Be Modified

For the reasons discussed, the stay should be dissolved, and OSHA should be permitted to respond to the particularly acute workplace danger of the COVID-19 virus. If the Court disagrees, however, the stay should be modified. The Standard utilizes several tools to address the grave danger of COVID-19 in the workplace. Although the Fifth Circuit focused on particular aspects of that response, the stay sweeps much more broadly and enjoins all aspects of OSHA's response, at the likely expense of employee lives and health.

**A.** If the Court were inclined to leave the stay in place, the stay should be modified so that the masking-and-testing requirement can remain in effect during the pendency of this litigation. Although vaccination is the most effective means of mitigating the grave danger of COVID-19 in the workplace, masking and testing for unvaccinated employees is a reasonably effective alternative (albeit not as effective as vaccination) that "reduce[s] the risk" of employees bringing COVID-19 into the "workplace" and "transmit[ting]" the virus to other employees. Pmbl.-61438-39.

While the Fifth Circuit found a likelihood of success on the merits with respect to many aspects of the Standard, much of the opinion focused on the vaccine requirement. The opinion often referred to the multi-faceted Standard as a "vaccine mandate." Slip op. 3 & n.4, 7 n.11, 8. The opinion seized on comments by the President about "vaccination," apparently suggesting that OSHA's analysis of workplace danger and the ability of vaccines to address that danger (all supported by

extensive empirical evidence) is pretextual. *Id.* at 7-8 & n.13. The opinion similarly characterized the Standard as an effort to "ramp up vaccine uptake by any means necessary." *Id.* at 15. And the opinion stated that the Standard "involves broad medical considerations" that "lie outside of OSHA's core competencies," *id.* at 18—an assertion that seems pointed at vaccination, rather than protective gear and testing. *See id.* at 18 n.20 ("hard hats and safety goggles, this is not").[16] In the equities discussion, the Court emphasized the harm to "liberty interests" of requiring employees to take "their jab(s)." *Id.* at 19. Indeed, since no employee would have to be tested until January 2022, the Fifth Circuit's issuance of an order before the case was even randomly assigned to a court of appeals may have been premised on its concerns about vaccination.

In this preliminary posture, "[t]he purpose" of "interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward" and to "mold" any "decree to meet the exigencies of the particular case." *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quotation marks and citation omitted); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("the traditional function of equity has been to arrive at a nice adjustment and reconciliation between the competing claims") (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). If the Court were to decline to dissolve the stay, these

[16] In addressing the Commerce Clause, the court referenced "States' police power," and the opinion's only citations involved courts upholding "compulsory vaccination" requirements. Slip op. 16-17 (citing *Zucht v. King*, 260 U.S. 174, 176 (1922), and *Jacobson v. Massachusetts*, 197 U.S. 11, 25-26 (1905)).

principles should guide the Court's "discretion and judgment." *Trump*, 137 S. Ct. at 2087. In light of the stay opinion's focus on mandating vaccination, the extraordinary and ongoing threat to employee safety in the workplace, and the proven ability of masking and testing to mitigate that threat, the Court should, at the very least, lift the portion of the stay that enjoins OSHA from requiring employers to ensure that unvaccinated workers wear a face covering in the workplace and get tested regularly for COVID-19.

**B.** Additionally, and if nothing else, any stay should be limited to the affirmative requirements imposed on employers, thereby leaving the Standard in effect to the extent that it gives employers the option to adopt COVID-19 policies. The Standard serves two stated functions: It establishes minimum workplace safety practices for employers with 100 or more employees. Pmbl.-61551 (to be codified at 29 C.F.R. § 1910.501(a)). And it shields all employers from "state and local requirements relating to these issues, including requirements that ban or limit employers' authority to require vaccination, face covering, or testing, regardless of the number of employees." *Id.* (also to be codified at 29 C.F.R. § 1910.501(a)); *see* Pmbl.-61507. In other words, the Standard sets a baseline giving employers of all sizes the option of implementing vaccination or masking-and-testing policies (even in the face of contrary state law), then sets additional requirements for large employers.

OSHA fully described the principles animating the separate need for preemptive effect. State and local requirements prohibiting certain mitigation measures prevent

"employers operating in those jurisdictions" from choosing to use "proven method[s] of protecting workers from the hazard of COVID-19." Pmbl.-61507. The Standard thus permits even small employers who are not presently required to implement vaccination or masking-and-testing policies to make decisions about whether to do so. Pmbl.-61509. Because the "maintenance" of employers' "choice" is a "significant federal regulatory objective," that policy is itself an important aspect of the regulatory scheme that must be given due weight. *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011); *see Geier v. American Honda Motor Co.*, 529 U.S. 861, 874-886 (2000).

"The equities relied on" by the Fifth Circuit "do not balance the same way" in this "context." *Trump*, 137 S. Ct. at 2088. The court stressed that the Standard "threatens to substantially burden" individuals' "liberty interests." Slip op. 18-19. And while the court's discussion of the public interest made no mention of the thousands of lives at stake, the court tied the "public interest" to the asserted risk that the Standard may infringe on "liberty." *Id.* at 20. But the shield for employers who wish to implement workplace safety rules protects, rather than restricts, liberty. It ensures that employers (of all sizes) can run their businesses as they see fit and protect their employees from a particularly acute workplace danger.

The State petitioners have contended they are harmed by the Standard's preemptive effect. But where the "maintenance" of employers' "choice" is a "significant federal regulatory objective," that policy governs. *Williamson*, 562 U.S. at 330. Myriad federal laws regulate private parties and address subjects that are also

addressed by state or local laws. The Supremacy Clause provides a "rule of decision" about how to reconcile any conflicting commands. *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018). The fact that employers may choose the best protections for their own workplaces during the pendency of this case is not the kind of concrete and significant injury that warrants "an extraordinary remedy." *Winter*, 555 U.S. at 22; *cf. Murphy*, 138 S. Ct. at 1481 ("[E]very form of preemption is based on a federal law that regulates the conduct of private actors.").

It would also be particularly anomalous to invoke any asserted "intrusion" on state or local regulation to justify enjoining the operation of federal regulation. Some intrusion on a sovereign's choices is on both sides of the balance. The Supremacy Clause establishes which interest takes precedence. *Cf. United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (describing the manifest interest in "preventing a violation of the Supremacy Clause"), *cert. denied*, 141 S. Ct. 124 (2020). And a court order blocking the Standard is a far greater affront to sovereign prerogatives. Such an order would also threaten deaths and hospitalizations that employers wish to prevent. Those interests, and the government's interests in protecting employees and employers while this case proceeds, vastly outweigh petitioners' asserted harm.[17]

---

[17] There is also a significant question whether the State petitioners can properly invoke this Court's jurisdiction under 29 U.S.C. § 655(f). That provision authorizes "[a]ny person" to challenge an OSHA standard, *id.*, and the statute defines the word "person" as "one or more individuals, partnerships, associations, corporations, business trusts, legal representatives, or any organized group of persons," *id.* § 652(4). This

**C.** In all events, the government respectfully requests that the Court clarify the scope of any operative stay. The Fifth Circuit ordered that the Standard is stayed and that this order "applies with equal force to all related motions" that had already been "consolidated into th[e] case" in the Fifth Circuit. Slip op. 21 n.23. The court "further ordered that OSHA take no steps to implement or enforce" the Standard. *Id.* at 21. Ordinarily, OSHA (like virtually every agency) provides pre-enforcement information to the public about its sometimes technical rules so that the public can understand those rules and the agency's reasoning. OSHA also takes purely internal steps, such as drafting appropriate guidance or training employees who run call lines or conduct inspections, before it engages in formal implementation or enforcement. Even where a rule is stayed, those steps ensure that if the stay is lifted, the agency can provide accurate and consistent guidance and enforcement. The government does not understand the current stay to reach such purely informational or internal steps, which could cause no harm to the petitioners. But in light of the Fifth Circuit's broad language that OSHA can "take no steps to implement or enforce" the Standard, and in an abundance of caution, the government respectfully requests that the Court clarify the stay.

---

significant "question as to jurisdiction" makes these petitioners' likelihood of success on the merits "more *unlikely*." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). The Court does not have to decide that issue, however.

## CONCLUSION

This Court should dissolve the Fifth Circuit's stay as soon as possible.

Respectfully submitted,


BRIAN M. BOYNTON
*Acting Assistant Attorney General*
SARAH E. HARRINGTON
*Deputy Assistant Attorney General*
MICHAEL S. RAAB
ADAM C. JED

*s/ Brian J. Springer*
BRIAN J. SPRINGER
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

*Of Counsel:*

SEEMA NANDA
*Solicitor of Labor*
EDMUND C. BAIRD
*Associate Solicitor for Occupational Safety and Health*
LOUISE M. BETTS
*Counsel for Appellate Litigation*
BRIAN A. BROECKER
MARISA C. SCHNAITH
*Attorneys*
*U.S. Department of Labor*
*Office of the Solicitor, Suite S4004*
*200 Constitution Ave., NW*
*Washington, DC 20210*


November 2021

## CERTIFICATE OF COMPLIANCE

This motion contains 12,848 words. This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer